UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MONTRELL FUTRELL,               )
                                )
          Petitioner,           )
                                )
     vs.                        )          No. 4:09CV00028 AGF
                                )
DON ROPER,                      )
                                )
          Respondent.           )

**MEMORANDUM AND ORDER**

This matter is before the Court on the pro se petition of Missouri state prisoner,

Montrell Futrell, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner

was convicted of murder in the first-degree and armed criminal action for the September

25, 1997 shooting death of Torrie Ivy.  Three eye witnesses identified Petitioner as the

shooter.  Petitioner was sentenced to life imprisonment without the possibility of parole

for the murder conviction, with a concurrent sentence of life imprisonment for the armed

criminal action conviction.

In his petition for writ a of habeas corpus, Petitioner asserts the following 14

grounds for relief:

> (1)(a) the state violated his rights under *Brady v. Maryland*, 373 U.S. 83
> (1963), by withholding a police dispatch tape; and (b) defense counsel was
> ineffective for failing to object and ask for a mistrial when the tape surfaced
> on the last day of trial;

(2) the trial court improperly overruled Petitioner's motion to exclude the in-court identifications of two eyewitnesses (Erskalean Boyd and Warren Guice) as tainted by an impermissibly suggestive pretrial identification procedure;

(3) defense counsel was ineffective for failing to object effectively and in a timely fashion to the testimony of a state witness (Bambi Cross) as to "murders" committed by Petitioner;

(4) defense counsel was ineffective for failing to call a certain eyewitness (Charles Cooper) to testify about Boyd's statement at the scene of the crimes identifying another individual (Maurice Harvey) as the shooter;

(5) defense counsel was ineffective for failing to properly impeach Cross;

(6) defense counsel was ineffective for failing to depose and effectively cross-examine a city official (Gerry Fife) who testified to an incriminating statement made by Petitioner;

(7) defense counsel was ineffective for failing to investigate, interview, or depose a police detective (Byron Harrington) who testified for the defense;

(8) defense counsel was ineffective for failing to depose, subpoena, or call (a) another eyewitness (Orlando Carson), and (b) another police detective (Leonard Richards) involved in the case;

(9) post-conviction counsel was ineffective because she represented Carson in an unrelated case at the same time that she was representing Petitioner, and as a result did not subpoena Carson to testify at the post-conviction hearing;

(10) defense counsel was ineffective for failing to object to the admission of two firearms into evidence;

(11) defense counsel was ineffective for failing to hire or request an independent weapons expert to examine two weapons found at Harvey's residence;

(12) defense counsel was ineffective for failing to conduct an adequate investigation regarding defense witnesses (a) Hattie Futrell and (b) Carol Shegog;

- 2 -

(13) defense counsel was ineffective for failing to strike a venireperson who was married to an employee of the jail where Petitioner had been incarcerated with whom Petitioner had a conflict; and

(14) defense counsel was ineffective for failing to impeach Boyd with Guice's grand jury testimony that at the scene she had said that Harvey was the shooter.

Respondent argues that habeas relief should be denied because many of Petitioner's claims were procedurally defaulted; in any event, these defaulted claims lack merit; and the state court's adjudication of the remaining claims was legally and factually reasonable.  For the reasons set forth below, habeas relief shall be denied.

## **BACKGROUND**

Petitioner was convicted on May 26, 1999, following a three-day trial at which he was the sole defendant.  Approximately ten months before trial, Petitioner notified the state that he would be presenting an alibi defense that Petitioner was with his grandmother, Hattie Futrell, at her house throughout the night in question.  In response to Petitioner's request for the disclosure of alibi rebuttal evidence, the state did not disclose any such evidence.

The evidence viewed in the light most favorable to the verdict established the following: At approximately 11:30 p.m. on September 25, 1997, 18-year-old Torrie Ivy was gambling/playing dice with a group of friends, including Steven Bowden and Charles Cooper, on a street corner in south Saint Louis, Missouri.  There were also several others in the area, including Warren Guice, Orlando Carson, and Erskalean Boyd, who was Ivy's girlfriend.  Boyd was sitting on the porch of a house near the corner, adjacent to a

vacant lot.  Guice and Carson were standing on the sidewalk near the lot.  Two men with dark clothing and hooded sweatshirts passed through a gate in the lot, approximately two feet away from Boyd.  Boyd recognized the taller of the two men as Maurice Harvey.  The two men paused to put on their hoods as they approached the curb.  Guice recognized one of the men as Petitioner, whom he knew.  Petitioner asked Guice where he could buy marijuana, and Guice directed him toward the group gambling on the corner.  Harvey started to walk back toward the gate, and Petitioner walked toward the group playing dice on the corner and began shooting with a handgun, which was later "inconclusively" classified as a .38 caliber revolver.  Ivy was fatally shot twice in the face and three times in the head.  No one else was injured.

**The Investigation**

According to a police "scene report" (that was not introduced into evidence) prepared by Detective Byron Harrington and another homicide detective, Clarence Thomas, Boyd flagged down police officers shortly after the shooting and reported the incident.  Harrington and Thomas and two other officers responded to a police dispatch about the crimes and upon arrival at the scene, Harrington took charge of the investigation.  One of the officers who had arrived earlier, Leonard Richards, told Harrington that Bowden told him that he (Bowden) heard the gunfire but did not see anything.

The scene report continued, stating that Thomas interviewed Boyd briefly at the scene and later at the homicide office.  The report stated that Boyd told Thomas that she

saw two men approaching from the lot and putting on their hoods, and that she recognized one of them as someone she knew named Maurice, who walked toward the group on the corner and opened fire, killing Ivy. However, at the homicide office, Boyd identified Harvey from a photo spread as the person *accompanying* the shooter, rather than as the shooter. Harrington and Thomas also interviewed Carson at the homicide office where Carson identified a photo of Harvey as the shooter. The scene report ends with the statement that a "wanted" for murder and armed criminal action "was placed" for Harvey. (Resp. Ex F-1 at 117-23.)

A supplemental report prepared by Harrington explained that Harrington and Thomas had "erroneously" understood Boyd to say that Harvey was the shooter, when in fact what she had said was that Harvey accompanied the shooter, whose identity was still unknown.[1]

On December 5, 1997, police went to Harvey's house and found him hiding in a closet. They also found two weapons in the house. In the police report of the search, these weapons are listed as a .38 caliber revolver and a .22 caliber revolver, but in the narrative section of the report, the first weapon is referred to as a ".32 caliber gun."

Also on or about December 5, 1997, Cross, who was Petitioner's girlfriend at the time of the shooting, called the police, and told them that she was afraid of Petitioner and

---

[1]    The supplemental report is not in the record but is referenced in the police investigation report prepared sometime after January 29, 1998, discussed *infra*. (Resp. Ex. F-1 at 26.)

- 5 -

that he had told her that he had killed a man on "the south side" because the man had killed his cousin.  She also told the police about other murders in which Petitioner had been involved, but Petitioner's motion in limine to exclude such evidence of any crimes other than the charged crimes was granted.

On December 5, 1997, police showed Boyd a five-person photo array that included Petitioner.  She selected two photographs from the array, one of which was of Petitioner.  About a day later, Boyd called the police and identified the photo of Petitioner as the shooter.  She indicated, however, that she would need to see a live lineup to be sure.

On December 19, 1997, police officers arranged a four-person lineup, including Petitioner and three other individuals whom the police selected from the holdover cell because they had similar physical characteristics to Petitioner.  Petitioner, however, was the only person wearing a hooded sweatshirt in the lineup.  Guice viewed the participants through a one-way glass while each participant stepped forward, turned in a complete circle, and stepped back into the line.  Guice identified Petitioner as the shooter.  Police were unable to contact Boyd to view the live lineup, but on December 20, 1997, they showed her a photograph of it.  She selected Petitioner as the shooter.  On January 2, 1998, Bowden was shown a five-person photo array including Petitioner and four others who had similar physical characteristics, including skin complexion.  Bowden selected Petitioner as the shooter.

- 6 -

A police investigation report prepared sometime after January 29, 1998, stated that Harrington and another detective located Cooper and interviewed him on that date. Cooper told the detectives that when the shots were fired at the group, he and others ran off in different directions.  He heard Boyd screaming, "Maurice didn't have to kill Torrie!"  Cooper also told the detectives that Ivy was a nonviolent person, and that he (Cooper) did not know either Harvey or Petitioner.  (Resp. Ex. F-1 at 31.)  Cooper agreed to make a taped statement, a partial transcript of which appears in the record.  In this statement Cooper confirms that he heard Boyd shouting and telling police officers at the scene that someone named Maurice shot Ivy.  *Id.* at 32.

**The Trial Proceedings**

Petitioner's pre-trial motion to exclude Boyd's and Guice's identifications on the ground that they were based on impermissibly suggestive procedures was denied.  The trial court reasoned that even though Petitioner was the only person in the live lineup (and the photograph thereof) who was wearing a hooded sweatshirt, his clothing was not the sole basis for Guice's and Boyd's identifications.

Petitioner's three-day trial commenced on Monday, May 24, 1999.  Defense counsel told the jury in opening statement that the evidence would show that eyewitnesses told officers at the scene of the crime that Harvey was the shooter and only later changed their story to say that Petitioner was the shooter, that the police found a .38 caliber revolver at Harvey's residence, and that Petitioner was at his grandmother's house at the time of the crime.

State witnesses Bowden, Boyd, and Guice all identified Petitioner at trial as the shooter.  Boyd denied telling the police at the scene that Harvey had a gun or that he was the shooter.  Bowden acknowledged that at the scene, he only saw the shooter from the nose up.  Gerry Fife, a Deputy Marshal for the City of St. Louis, testified for the prosecution that while he was at the Prisoner Processing Section of the Police Department on December 19, 1997, he saw Petitioner and heard him say, "If all of the witnesses are gone, then I won't have to go to court."

Cross testified that she called the police in late 1997, and told them that Petitioner told her that he had killed a man on "the south side" because the man had killed his cousin.  On redirect examination, she referred four times to the "murders" that she had told the police about, before defense counsel objected, in a bench conference, to her use of the word "murders" in the plural as "getting awfully close" to violating the order on the motion in limine to exclude evidence of Petitioner's other crimes.  The Court told the prosecutor not to go "any further into it."

On cross-examination, defense counsel attacked Cross's credibility by getting her to admit that she had regularly visited Petitioner in the city jail after he was incarcerated, that she apologized to him about things in their relationship, and that she had written to Petitioner that "people are telling me that you and [another young woman named] Tee-Tee go together and neither of you are going to make a fool out of me."

The prosecution's remaining three witnesses were an individual who lived near the scene of the crimes and who testified that it was a fairly well-lit area; a forensic

pathologist who testified that Ivy's cause of death was the five gunshot wounds; and a police officer who testified that he talked to Cross in late 2007 and was able to "substantiate . . . other information" she reported receiving from Petitioner.

Petitioner did not testify, but called five witnesses – Harrington, two other police officers, Hattie Futrell, and Shegog – to present an alibi defense, and a misidentification defense based on the theory that Harvey was the shooter. On direct examination, Harrington was asked and testified to the portions of the scene report that stated that Boyd  had identified Harvey as the shooter. But on further examination by the prosecutor and defense counsel, Harrington clarified that at the scene, he and Thomas had assumed that Boyd's statement [that the shorter of the two hooded men was the shooter] was referring to Harvey as the shooter. Harrington testified that this was an incorrect assumption, as became clear when Boyd identified the photo of Harvey as the man who accompanied the shooter. Harrington explained that the statement in the scene report indicating that Boyd said that Harvey had the gun was based on his and Thomas's mistaken assumption at the scene. The Court sustained the state's objection to defense counsel's attempt to question Harrington about the statements in the scene report that Carson identified Harvey as the shooter. The court reasoned that because Carson had not been called as a witness, it was improper to ask Harrington about what Carson had told him.

The next two defense witnesses were the officers who had found the weapons at Harvey's house and prepared the report noted above with conflicting descriptions of one

of the revolvers.  On cross-examination, one of these officers testified that the narrative section of such a report – here, the section identifying the weapon in question as a .32 caliber gun and not a .38 caliber gun – was generally more accurate that the section listing the property found.

Shegog offered testimony contrary to Cross's statements.  Shegog testified that she and Cross became friends in 1997, after the charged crimes, and that Cross told her that her relationship with Petitioner was good, and that she did not think he committed the crimes.  She further testified that Cross found out that Petitioner was seeing Tee-Tee and was jealous and upset about this.  On cross-examination, the prosecutor impeached Shegog with a prior federal conviction (guilty plea) for mail fraud.

Petitioner's last witness was Hattie Futrell.  She testified that she had essentially raised Petitioner since his infancy.  She testified that Petitioner's close friend had been killed earlier on the day of the shooting, and because Petitioner's mother was afraid someone may also be looking for Petitioner, Petitioner's mother told his grandmother to keep him at her house.  She further testified that she knew Petitioner did not leave the house after 5:00 p.m. because had he done so, the Brinks alarm system that had been installed at the house in 1997, would have sounded "chimes," and she heard no such chimes.  Further, Petitioner did not have a key to the house that was needed to unlock the front door.

On cross-examination, the state presented a work order for the Brinks alarm system at the house showing that it had not been installed until December 3, 1997.

- 10 -

Defense counsel, who was surprised by this evidence, moved to exclude it on the ground that it had not been disclosed prior to trial.  The court overruled the motion, agreeing with the state's position that this was not rebuttal evidence, but rather non-discoverable impeachment evidence.

Defense counsel then played the police dispatch tape from the night of the crimes.[2] Defense counsel explained to the court that he had received the tape that day in response to his subpoena to the police.  On the tape, police officers describe the large crowd that had gathered at the scene of the shooting and the hysteria of some of those present. Eventually, an officer stated that a witness described two men as involved in the shooting – one was named Maurice, and the second, who was the shooter, was 5' 5" tall, 130 pounds, and with hazel eyes.  (Resp. Ex. J.)  Petitioner was 6' tall, weighed 150 pounds, and had brown eyes.[3]

The state recalled the officer who had testified about the two guns found at Harvey's house.  He identified two state's exhibits, which were admitted into evidence with no objection by Petitioner, as those guns – one was a .22 caliber and the other a .32 caliber.

In closing, defense counsel emphasized the mistakes and contradictions in the

---

[2]   It is not entirely clear from the trial transcript whether the whole tape was played or just a portion of it.

[3]   Harvey was not present at the trial, nor was he ever described to the jury. (Resp. Ex. F-2 at 171.)

evidence, and argued misidentification.  Defense counsel began his closing argument as

follows:

> Ladies and gentlemen, I got to tell you, you know, when I first started
> looking at this case I did believe that Maurice was the shooter.  I knew he
> was there, and I made an honest mistake like all the mistakes that have
> happened in this case, but I hope you don't make that mistake that I made
> against Montrell Futrell because it's a tragedy that an 18-year old kid was
> killed in the city street.  It would be a bigger tragedy if we send an innocent
> young man to prison for something he didn't do.

(Resp. Ex. A at 354.)  Counsel argued that this was a case of misidentification.  He

argued that the eyewitness identifications were not reliable, and pointed to the differences

between the description of the suspect on the police dispatch tape and Petitioner.

Defense counsel had Petitioner stand and face the jury to emphasize the fact that

Petitioner was not 5' 5", weighed more than 130 pounds, and did not have hazel eyes.

Prior to sentencing, defense counsel was given the opportunity to present argument

on his motion for a new trial.  Defense counsel focused his argument for a new trial on

the claim that the police dispatch tape was exculpatory *Brady* material that had not been

provided to him prior to trial.  Defense counsel stated that he was not aware of the tape's

contents until the second day of trial, which affected the defense and trial strategy he

pursued.  The prosecutor maintained that he was also unaware of the existence of the tape

until Petitioner's counsel obtained it, and further that Petitioner was not prejudiced

because he was able to play the tape to the jury at trial.  The trial court overruled

Petitioner's motion for a new trial and sentenced Petitioner as set forth above.

**Direct Appeal**

Petitioner raised three points on direct appeal: (1) that his constitutional rights were violated by the state's failure to disclose the Brinks work order, which Petitioner argued was rebuttal evidence and not merely impeachment evidence; (2) that the trial court erred in failing to grant Petitioner's motion for new trial based on the state's failure to obtain and provide a copy of the police dispatch tape prior to trial, arguing that the failure to produce the tape forced Petitioner to pursue the defense theory that Harvey was the shooter, which he would not have done had he had the tape prior to trial, and which weakened the credibility of his case in the eyes of the jury once the tape was played; and (3) the trial court erred in overruling defense counsel's motion to suppress Boyd's and Guice's in-court identifications because they were tainted by an impermissibly suggestive lineup in which Petitioner was the only person wearing a hooded sweatshirt.  The state appellate court issued a summary order affirming the conviction and sentence.  *State v. Futrell*, 23 S.W.3d 729 (Mo. Ct. App. 2000).

**Postconviction Proceedings**

On December 1, 2000, Petitioner filed a pro se motion for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15.  His first claim was that defense counsel was ineffective in failing to uncover prior to trial, by reasonable investigation, the police dispatch tape.  Petitioner maintained that had counsel done so, he would not have pursued a defense based on the theory that Harvey was the shooter.  Petitioner also raised habeas claims (11) (not calling a weapons expert); (8)(a) (not calling Carson); (4) (not calling

- 13 -

Cooper); (14) (faulty impeachment of Boyd); (13) (not striking a venireperson); (3) (not objecting to Cross's use of the word "murders"); (12)(a) (not investigating Hattie Futrell's alibi story); and (2) (tainted in-court identifications), listed above.

On January 10, 2002, appointed counsel filed her entry for appearance and requested additional time to file an amended motion. On March 26, 2002, Petitioner, with the assistance of appointed counsel, filed an amended motion for post-conviction relief which only raised habeas claims (3), (4), (7) (calling Harrington), and (12)(a) and (b) (not uncovering Shegog's prior conviction).

A hearing on the post-conviction motion was held on August 22, 2006, at which defense counsel and Cooper testified. At the start of the hearing, Petitioner's counsel told the court that Petitioner wished to pursue the ineffective assistance of counsel claim regarding the police dispatch tape. The court sustained the State's objection that the claim had been procedurally defaulted because it was not included in the amended motion, but allowed an offer of proof in the form of defense counsel's testimony.

Defense counsel proceeded to testify that he had been practicing criminal law for approximately 20 years. He testified that although the emergence of the police dispatch tape on the second day of trial was a surprise, he decided after reviewing it, to play it for the jury, believing it was exculpatory and consistent with both of Petitioner's defenses, in that the description of the suspect on the tape did not fit Petitioner.

Defense counsel then testified regarding the claims raised in the amended post-conviction motion. He testified that his trial file included a note from an investigator that

- 14 -

Shegog had no prior convictions, but that he was not sure of the investigator's source for

that statement.  Counsel testified that he would have called Shegog even had he known

about her prior conviction, but would have brought out the conviction on direct

examination.

Defense counsel testified that he relied on statements by Petitioner, Petitioner's

mother, and Hattie Futrell with regard to Hattie Futrell's intended alibi testimony, and

that he found Hattie Futrell to be credible.  However, had he been provided with the

evidence of the date the alarm system was installed, he would not have had her testify

about the alarm system.  With respect to his failure to call Cooper as a witness (to testify

to the shouts he heard identifying "Maurice" as the shooter), defense counsel testified that

he had filed a motion in limine to prevent Cooper from testifying that Ivy was nonviolent.

He testified that he did not interview Cooper because he believed Cooper and Ivy were

friends, and he (defense counsel) had no reason to believe Cooper could be counted on to

give favorable testimony.

Defense counsel testified that he called Harrington as a witness despite the

likelihood of Harrington providing an explanation for the inconsistencies between the

scene report and the later investigation report with respect to Boyd's identification of the

shooter.  Defense counsel believed that Harrington was the only means through which he

could introduce Boyd's inconsistent statements regarding which of the two men was the

shooter, and that he took a calculated risk in calling Harrington as a witness.  Defense

counsel testified that he could not recall why he did not object immediately to Cross's use

- 15 -

of the word "murders," but that it could have been because such an objection might have highlighted the references.

Cooper testified that the police investigation report inaccurately recorded his statements regarding Boyd's screaming.  He testified that instead of telling police that Boyd exclaimed "Maurice" did not have to kill Ivy, he recalled telling the police that Boyd had said "they" did not have to kill Ivy.  He stated that had he been called to testify, he would have disputed any police report or audio tape to the contrary.  Cooper testified that he did not see who shot Ivy, that he did not know Petitioner or Harvey at the time of the crimes, and that he himself had prior convictions for murder and drug trafficking.

The motion court denied post-conviction relief.  On appeal from this denial, Petitioner raised claims of ineffective assistance of defense counsel that were in the amended motion for post-conviction relief, challenging defense counsel's failure to uncover and bring out Shegog's prior conviction on direct examination, failure to investigate fully Hattie Futrell's alibi testimony, calling Harrington as a witness, failure to object timely to Cross's references to "murders," and failure to call Cooper as a witness.

The Missouri Court of Appeals rejected all of Petitioner's points on appeal.  The court held that defense counsel conducted a reasonable investigation into Shegog's criminal history, and that in any event, there was no reasonable probability that the result of the trial would have been different had defense counsel, rather than the prosecutor, brought out Shegog's conviction for mail fraud.  The state appellate court also found that defense counsel conducted a reasonable investigation into the alibi defense suggested by

Petitioner, and was entitled to rely on Petitioner's and Hattie Futrell's statements regarding this defense.  Furthermore, the appellate court reasoned that even without the prosecutor's presentation of the security system installation order, the jury "was free to reject" the alibi defense in light of Petitioner's grandmother's close relationship to him and the "overwhelming weight of the evidence against him."

The state court next addressed Petitioner's claim that defense counsel was ineffective for failing to interview or depose Harrington before trial and for calling him as a witness.  According to the appellate court, the record established that defense counsel had examined the police reports and that "because the police reports disclosed the anticipated testimony, trial counsel had no need to investigate [Harrington] further in view of [Petitioner's] defense of mistaken identity."  The court further reasoned that Harrington's testimony regarding Boyd's inconsistent statements was the only testimony upon which trial counsel could establish a defense of mistaken identity, and that there was no reasonable probability that the result of the trial would have been different had counsel not called Harrington.

The state appellate court denied Petitioner's last two claims on the grounds, finding that Cross's references to "murders" were vague, and that defense counsel's failure to call Cooper was reasonable trial strategy.

## DISCUSSION

### Procedural Default

Under the doctrine of procedural default, "a federal [habeas] court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, ___ U.S. ___, 2012 WL 912950, at *6 (March 20, 2012).  An exception to this rule is that "[a] prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.*[4]  Attorney error on the part of post-conviction counsel at the initial-review stage may qualify as cause for a procedural default. *Id.* at *7.

Here, Petitioner failed to raise four of the habeas claims he now asserts, in either his pro se or amended post-conviction motion: claims (5) (not impeaching Cross), (6) (faulty cross-examination of Fife), (9) (post-conviction counsel's conflict of interest), and (10) (not objecting to admission of weapons).  Thus, these claims were procedurally defaulted. *See, e.g., Sweet v. Delo,* 125 F.3d 1144, 1149 (8th Cir. 1997).  Petitioner

---

[4]   The Court can also reach the merits of Petitioner's claims if he can show that he is "probably actually innocent" of the crimes for which he was convicted, by proving his allegations of constitutional error "with new reliable evidence . . . that was not presented at trial," and establishing "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *See Bowman v. Gammon*, 85 F.3d 1339, 1346 (8th Cir. 1996) (citing *Schlup v. Delo*, 513 U.S. 298 (1995)). Petitioner fails to make this showing.

makes no argument that the default should be excused with respect to these claims, nor does the court perceive any. Claims 8(a) and (b), (11), (13), (14), and a version of (1)(b) were included in Petitioner's pro se post-conviction motion, but were omitted in the amended motion filed by appointed counsel. In light of *Martinez*, this Court will err on the side of caution, and review the merits of these claims.

## **Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996,

> [f]ederal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of this Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

*Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

"For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id.* (quoting *Williams*, 529 U.S. at 410). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87; *see also Hardy v. Cross*, 132 S. Ct. 490, 491

(2011) (noting that AEDPA "imposes a highly deferential standard for evaluating

state-court rulings and demands that state-court decisions be given the benefit of the

doubt") (quoting another source).  The summary nature of the decision of the Missouri

Court of Appeals on direct appeal does not preclude application of the AEDPA standard.

*Brown v. Luebbers*, 371 F.3d 458, 462 (8th Cir. 2004).

**The Police Dispatch Tape**

Petitioner argues in his habeas petition that the police dispatch tape was

exculpatory in that its description of the shooter clearly did not fit Petitioner.  He further

argues that the state could have obtained the tape with reasonable effort.  Thus, Petitioner

argues, the prosecution had a duty under *Brady* to uncover the tape and turn it over to the

defense.  Petitioner posits that had this been done, defense counsel would not have argued

to the jury in opening argument that Harvey was the shooter, an argument that hurt

Petitioner's case.  Petitioner's related claim of ineffective assistance of counsel, that

defense counsel should have asked for a mistrial when the tape was provided to him,

rather than play it to the jury, will be discussed below.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the

prosecution of evidence favorable to an accused . . . violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad

faith of the prosecution."  373 U.S. at 87.  Evidence is material "if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682

(1985).  In order to comply with *Brady*, the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Thus, there are three components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Analysis under *Brady* often turns on whether the excluded evidence is material.  In the absence of materiality, courts consider any failure to disclose information to a defendant to be harmless error.  *Dye v. Stender*, 208 F.3d 662, 665 (8th Cir. 2000).  Furthermore, "[u]nder the rule in [the Eighth Circuit] *Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial."  *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005) (internal citation omitted).

Here, the Court concludes that the prosecutor was under an obligation to obtain the police dispatch tape and disclose it to Petitioner.  The Court cannot say, however, that this oversight was material to the outcome of the trial.  The prejudice posited by Petitioner is not that the jury did not hear the exculpatory evidence, i.e., the description of the shooter that did not fit Petitioner.  Rather, according to Petitioner, he was prejudiced because had the prosecution disclosed the tape prior to trial, defense counsel would not have argued to the jury in opening statement that Harvey was the shooter.  This court

- 21 -

cannot say that the Missouri state courts' rejection of the argument was an unreasonable application of the facts to federal law.  The jury heard the exculpatory evidence and defense counsel had the opportunity during closing argument to explain the situation to the jury and to focus on the exculpatory nature of the police dispatch tape, consistent with the theories of misidentification and alibi, as indeed counsel did.  Further, in light of the substantial eyewitness testimony, and Petitioner's own somewhat inculpatory statements, the Court finds no reasonable probability that with timely disclosure the result of the proceeding would have been different.

**Identification Evidence**

Due process challenges to convictions based on in-court identifications which followed a suggestive out-of-court confrontation are reviewed under a two-step test: the first step is to determine whether the challenged confrontation between the witness and the suspect was "impermissibly suggestive"; if so, the second inquiry is whether, under the totality of the circumstances, the suggestive confrontation created "a very substantial likelihood of irreparable misidentification."  *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977).  Those identifications which are reliable – where the witness's perception of the suspect unaided by the suggestive confrontation provided a sufficient foundation for the identification – are admissible.

Reliability is determined by examining (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention at the time of the crime, (3) the accuracy of his prior description of the criminal, (4) the level of certainty

demonstrated at the confrontation, (5) and the time between the crime and the confrontation. *Manson*, 432 U.S. at 114 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Id.*; *accord Manning v. Bowersox*, 310 F.3d 571, 577 (8th Cir. 2002).

Here the Court concludes that the state courts' adjudication of this claim was not factually or legally unreasonable. The only challenge offered by Petitioner to the photo array is that Petitioner was the only person wearing a hooded sweatshirt. With respect to Guice's identification of Petitioner, this clearly had no corrupting affect as Guice knew Petitioner and even spoke to him at the scene of the crime. Nor does Petitioner's clothing at the lineup mandate a finding that the lineup was impermissibly suggestive with respect to Boyd's pretrial identification, especially as a hooded sweatshirt is not such an unusual article of clothing. *See Maldonado v. Burge,* 697 F. Supp. 2d 516, 543 (S.D.N.Y. 2010) (rejecting claim that photo array was unduly suggestive because the petitioner was the only person in the array wearing a brown jacket, and the witness identifying him had described him as wearing a brown leather jacket during the crime). The Court notes that the lineup about which Petitioner complains was not conducted until several weeks after the crimes, so there is less reason to suspect that the clothing of the participants in the lineup would be unduly suggestive of the perpetrator, as clothing can easily be changed. *See Chandler v. Sherry,* No. 08-CV-10249, 2010 WL 4791147, at *11 (E.D. Mich.) (Nov. 17, 2010).

- 23 -

Furthermore, Petitioner does not challenge the positive in court identification by Bowden, which along with the other evidence presented by the state, was strong evidence of Petitioner's guilt.  Thus, even an erroneous admission of Boyd's identification would not have had a sufficient "substantial and injurious effect" to warrant federal habeas relief.  *See Fry v. Pliler,* 551 U.S. 112, 121-22 (2007) (adopting the "substantial and injurious effect" standard for assessing the prejudicial impact of constitutional error in a state-court criminal trial so as to warrant federal habeas cases); *Evans v. Lock*, 193 F.3d 1000, 1003 (8th Cir. 1999) (holding that even under the harmless-beyond-a-reasonable-doubt standard, the erroneous admission of identification evidence did not warrant habeas relief, given the strong evidence, on the record as a whole, of the petitioner's guilt).  This is especially true as no ground exists for suppression of Guice's identification of an individual known to him.  Accordingly, the Court concludes that habeas relief is not warranted on this claim.

**Claims of Ineffective Assistance of Counsel**

"The right to the effective assistance of counsel at trial is a bedrock principle in our justice system."  *Martinez*, 2012 WL 912950, at *8.  To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish both "that counsel's representation fell below an objective standard of reasonableness," and that but for counsel's deficiency there is "a reasonable probability" that the result of the trial would have been different.  *Strickland v. Washington*, 466 U.S. 688, 694 (1984).  Error by counsel, even if professionally unreasonable, does not necessarily require that a

judgment be set aside.  A defendant must affirmatively show prejudice by showing that

but for counsel's error, there is a reasonable probability that the result of the proceeding

would have been different.  *Id.* at 694.  Moreover, in the context of a § 2254 petition, a

petitioner

> must do more than show that he would have satisfied *Strickland*'s test if his
> claims were being analyzed in the first instance, because under § 2254(d)(1),
> it is not enough to convince a federal habeas court that, in its independent
> judgment, the state-court decision applied *Strickland* incorrectly.  Rather he
> must show that the [state court] applied Strickland to the facts of his case in
> an objectively unreasonable manner.

*Underdahl v. Carlson*, 381 F.3d 740, 742 (8th Cir. 2004) (quoting *Bell v. Cone*, 535 U.S.

685, 698-99 (2002)).  Furthermore, the Eighth Circuit has held that "a habeas petitioner

cannot build a showing of prejudice on a series of errors, none of which would by itself

meet the prejudice test."  *Hall v. Luebbers*, 296 F.3d 685, 692-93 (8th Cir. 2002); *see*

*also Kennedy v. Kemna*, 666 F.3d 472, 485 (8th Cir. 2012).

a.    **Calling Harrington as a Defense Witness**

Upon review of the record, the Court does not believe that the state appellate

court's decision with respect to this claim was contrary to or involved an unreasonable

application of *Strickland*, or that it was based on an unreasonable determination of the

facts in light of the state court record.  Calling Harrington was a matter of trial strategy

and a federal habeas court "may not second-guess counsel's reasonable strategic

decisions" when addressing a claim of ineffective assistance of counsel.  *Cole v. Roper,*

623 F.3d 1183, 1191 (8th Cir. 2010).  Unless an attorney's investigation was deficient,

"there is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Worthington v. Roper*, 631 F.3d 487, 502 (8th Cir. 2011) (*quoting Strickland*, 466 U.S. at 689).  By calling Harrington, defense counsel was able to present to the jury conflicting evidence as to who the shooter was and of eye witnesses changing their stories.  The jury was free to disbelieve the witnesses' trial testimony based on the conflicting statements.  This was not risk free, as defense counsel recognized, but this Court cannot say that counsel's decisionmaking fell outside the bounds of reasonable trial strategy.

**b.**    **Other Claims of Ineffective Assistance of Defense Counsel Adjudicated by the State Courts**

The Court does not believe that the state court's adjudication of Petitioner's remaining claims of ineffective assistance of counsel that were raised in the amended motion for post-conviction relief was unreasonable in any way.  As the state appellate court held, the fact that the prosecutor brought out Shegog's prior conviction for mail fraud rather than defense counsel did not result in prejudice to the extent that there is a reasonable probability of a different outcome.  The Court also agrees that defense counsel was entitled to rely on Petitioner's and Hattie Futrell's representations to him regarding the alibi defense and was not ineffective for failing to investigate the veracity of their statements.  Further, Cross's references to "murders" were vague, and any objection might have served to highlight the references.  Finally, Cooper's testimony at the post-conviction hearing confirms that it was reasonable trial strategy not to call him as a

- 26 -

defense witness.  Had defense counsel called him, the result of the trial would not have been different, and indeed, the evidence could have been more damaging.

**c.**     **Remaining Claims of Ineffective Assistance of Defense Counsel**

The four claims of ineffective assistance of defense counsel that were omitted from the amended motion for post-conviction relief are also without merit, largely for the reasons set forth by Respondent.  The Court notes that three of these claims – failure to call Carson, failure to impeach Boyd with Guice's grand jury testimony, and failure to hire a weapons expert – rely upon the abandoned defense theory that the shooter was Harvey.  The claim that defense counsel should have stricken a venireperson is defeated by this venireperson's affirmative statements during voir dire that she could render a fair verdict, and that she believed that memories can be imperfect, as well as by Petitioner's failure to show any bias on her part.  *See Taylor v. Dormire*, No. 4:06CV1633 DJS, 2010 WL 2735616, at *9 (E.D. Mo. Feb. 17, 2010) (rejecting claim that defense counsel was ineffective in failing to strike the daughter of a former housekeeper in the prosecutor's childhood home; explaining that "the decision to strike a venireperson is generally a matter of trial strategy and reasonable decisions regarding trial strategy cannot be the basis for an ineffective assistance of counsel claim")

Lastly, defense counsel's failure to call Richards to rebut Bowden's identification of Petitioner did not result in *Strickland* prejudice in light of the other eyewitness identifications, especially that of Guice, and the other evidence of Petitioner's guilt.

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief.[5]

Further, the Court does not believe that reasonable jurists might find the Court's

assessment of the procedural or substantive issues presented in this case debatable or

wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C.

§2254(d)(2).  *See Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) (standard for issuing a

Certificate of Appealability) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY ORDERED** that the Petition of Montrell Futrell for a writ of

habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability shall not issue

in this case.

A separate Judgment shall accompany this Memorandum and Order.


                                                        _____
                                                        AUDREY G. FLEISSIG
                                                        UNITED STATES DISTRICT JUDGE

Dated this 29th day of March, 2012.

---

[5]    The Court has also reviewed the merits of Petitioner's defaulted claims and is
satisfied that none warrant federal habeas relief.

- 28 -